IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Eugene King, | ) | C/A No. 0:12-949-CMC-PJG |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Robert M. Stevenson, III, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

Petitioner Eugene King ("King"), a self-represented state prisoner, filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter comes before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) DSC for a Report and Recommendation on the respondent's motion for summary judgment. (ECF No. 22.) Pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), King was advised of the summary judgment and dismissal procedures and the possible consequences if he failed to respond adequately to the respondent's motion. (ECF No. 24.) King then filed a cross-motion for summary judgment, which he supplemented (ECF Nos. 27 & 29) and a response in opposition to the respondent's motion. (ECF No. 33.) Having carefully considered the parties' submissions and the record in this case, the court concludes that the respondent's motion for summary judgment should be granted and King's motion and Petition denied.

## BACKGROUND

King was indicted in September 2003 in Orangeburg County for murder (03-GS-38-1623). (App. at 468-69, ECF No. 23-11 at 68-69.) King was represented by Robert E. Hood, Esquire, and on November 7-9, 2005 was tried before a jury and found guilty as charged. (App. at 366, ECF No.

23-10 at 91.)  The circuit court sentenced King to forty years' imprisonment.  (App. at 375, ECF No.
23-10.)

 King timely appealed and was represented by Robert M. Dudek, Esquire, of the South
Carolina Office of Appellate Defense, who filed an <u>Anders</u>[1] brief on King's behalf that raised the
following issue:

> Whether the court erred by admitting appellant's confession where there was
> evidence appellant was so intoxicated he did not remember the alleged incident, and
> he was incapable of appreciating the nature of what he was saying to the police, since
> a confession given under these circumstances was not voluntarily tendered?

(ECF No. 23-1.)  King filed a *pro se* response to the <u>Anders</u> brief in which he presented additional
issues.  (ECF No. 23-2.)  On September 17, 2008, the South Carolina Court of Appeals issued an
order dismissing King's appeal.  (<u>State v. King</u>, Op. No. 08-UP-538 (S.C. Ct. App. Sept. 17, 2008);
ECF No. 23-3.)  The remittitur was issued October 6, 2008.  (ECF No. 23-4.)

 King filed a *pro se* application for post-conviction relief ("PCR") on October 13, 2008 in
which he raised several issues.  (<u>King v. State of South Carolina</u>, 08-CP-38-1686; App. at 380-85,
ECF No. 23-10 at 105-10.)  The State filed a return.  (App. at 393-97, ECF No. 23-10 at 118-22.)
On March 2, 2010, the PCR court held an evidentiary hearing at which King appeared and testified
and was represented by Clarissa W. Joyner, Esquire.  (App. at 398-456, ECF No. 23-10 at 123
through ECF No. 23-11 at 56.)  At the PCR hearing, PCR counsel stated that the issues before the
court were three claims of ineffective assistance of trial counsel, which she summarized as follows:

---

[1] <u>Anders v. California</u>, 386 U.S. 738 (1967).  <u>Anders</u> requires that counsel who seeks to
withdraw after finding the "case to be wholly frivolous" following a "conscientious examination"
must submit a brief referencing anything in the record that arguably could support an appeal; furnish
a copy of that brief to the defendant; and after providing the defendant with an opportunity to
respond, the reviewing court must conduct a full examination of the proceedings to determine if
further review is merited.  <u>Anders</u>, 386 U.S. at 744.



(1) trial counsel was ineffective in failing to adequately challenge or question Johnny Richardson, a witness, concerning different or conflicting versions of a statement; (2) trial counsel was ineffective in failing to present King's booking photograph at the <u>Jackson v. Denno</u> hearing to support King's claim that his intoxication prevented him from giving a knowing and voluntary statement; and (3) trial counsel was ineffective in failing to explore the fact that evidence in discovery indicated that there was no blood on the tire iron, which King alleged was the "lynchpin" of the prosecution's case because the prosecution argued that the tire iron was used to kill the victim. (App. at 402-05, ECF No. 23-11 at 2-5; <u>see also</u> App. at 453-54, ECF No. 23-11 at 53-54.)  By order dated October 1, 2010, the PCR judge denied and dismissed with prejudice King's PCR application. (App. at 458-67, ECF No. 23-11 at 58-67.)

King appealed.  In his PCR appeal, King was represented by Robert M. Pachak, Esquire, Appellate Defender for the South Carolina Commission on Indigent Defense, who filed a <u>Johnson</u>[2] petition for a writ of certiorari on King's behalf that presented the following issue:

> Whether trial counsel was ineffective in failing to object to a tire iron admitted into evidence as the murder weapon at petitioner's trial when no DNA profile could show it was the murder weapon?

(ECF No. 23-5.)  King filed multiple *pro se* responses to the <u>Johnson</u> petition in which he presented issues regarding the denial of his PCR application and the filing of his petition for a writ of certiorari. (ECF No. 23-6.)  On March 9, 2012, the South Carolina Supreme Court denied King's petition for a writ of certiorari.  (ECF No. 23-7.)  The remittitur was issued March 27, 2012.  (ECF No. 23-12.) This action followed.

---

[2] <u>Johnson v. State</u>, 364 S.E.2d 201 (S.C. 1988) (applying the factors in <u>Anders v. California</u>, 386 U.S. 738 (1967) to post-conviction appeals).



## FEDERAL HABEAS ISSUES

In King's federal petition for a writ of habeas corpus, he raises several rather lengthy issues for consideration, which the respondent has categorized as follows:

I.     State introduce[d] a tire iron into evidence at trial. However, there was no DNA profile on the tire iron and the prosecution claimed it was the murder weapon.

     1.     SLED Lab Report showed [the] tire iron had no DNA profile.

     2.     State failed to disclose exculpatory evidence.

II.     Statement taken from Petitioner when he was in an intoxicated state and under the influence of a controlled substance. . . .

III.     Ineffective Assistance of Counsel.

     1.     Counsel did not object to the introduction of the tire iron where it was not connected to incident with physical evidence. . . .

     2.     Counsel failed to impeach witness Johnny Richardson with [his] inconsistent statement and failed to object to Richardson's testimony. . . .

     3.     Counsel objected to Petitioner's statement in Jackson v. Denno hearing, but failed to introduce to [the] jury the booking photo to show [King] was under the influence at the time or read the coerced statement. . . .

IV.     Prosecutorial Misconduct.

     1.     Prosecutor misle[]d jury on [the] murder weapon. . . .

(Ret. & Mem. Supp. Summ. J. at 5, ECF No. 23 at 5.)

## DISCUSSION

**A.**    **Summary Judgment Standard**

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law."



Fed. R. Civ. P. 56(a). A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Rule 56 mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248.

The moving party has the burden of proving that summary judgment is appropriate. Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(c), (e); Celotex Corp., 477 U.S. at 322. Further, while the federal court is charged with liberally construing a petition filed by a *pro se* litigant to allow the development of a potentially meritorious case, see, e.g., Cruz v. Beto, 405 U.S. 319 (1972), the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth a federal claim, nor can the court assume the existence of a genuine issue of material fact where none exists. Weller v. Dep't of Soc. Servs., 901 F.2d 387 (4th Cir. 1990).



### B.    Habeas Corpus Standard of Review

In accordance with the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), claims adjudicated on the merits in a state court proceeding cannot be a basis for federal habeas corpus relief unless the decision was "contrary to, or involved an unreasonable application of clearly established federal law as decided by the Supreme Court of the United States," or the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d)(1), (2).  When reviewing a state court's application of federal law, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Williams v. Taylor, 529 U.S. 362, 410 (2000); see also Harrington v. Richter, 131 S. Ct. 770, 785 (2011); Humphries v. Ozmint, 397 F.3d 206 (4th Cir. 2005); McHone v. Polk, 392 F.3d 691 (4th Cir. 2004).  Moreover, state court factual determinations are presumed to be correct and the petitioner has the burden of rebutting this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Harrington, 131 S. Ct. at 786 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  Under the AEDPA, a state court's decision "must be granted a deference and latitude that are not in operation" when the case is being considered on direct review.  Id. at 785.  Moreover, review of a state court decision under the AEDPA standard does not require an opinion from the state court explaining its reasoning.  See id. at 784 (finding that "[t]here is no text in [§ 2254] requiring a statement of reasons" by the state court).  If no explanation accompanies the state court's decision, a federal habeas petitioner must show that there was no reasonable basis for the state court to deny relief.  Id.  Pursuant to



§ 2254(d), a federal habeas court must (1) determine what arguments or theories supported or could have supported the state court's decision; and then (2) ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding of a prior decision of the United States Supreme Court.  Id. at 786. "If this standard is difficult to meet, that is because it was meant to be."  Id.  Section 2254(d) codifies the view that habeas corpus is a " 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal."  Id. (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)).

## C.    Exhaustion Requirements

A habeas corpus petitioner may obtain relief in federal court only after he has exhausted his state court remedies.  28 U.S.C. § 2254(b)(1)(A).  "To satisfy the exhaustion requirement, a habeas petitioner must present his claims to the state's highest court." Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir. 1997), abrogated on other grounds by United States v. Barnette, 644 F.3d 192 (4th Cir. 2011); see also In re Exhaustion of State Remedies in Criminal and Post-Conviction Relief Cases, 471 S.E.2d 454, 454 (S.C. 1990) (holding that "when the claim has been presented to the Court of Appeals or the Supreme Court, and relief has been denied, the litigant shall be deemed to have exhausted all available state remedies.").  To exhaust his available state court remedies, a petitioner must "fairly present[] to the state court both the operative facts and the controlling legal principles associated with each claim."  Longworth v. Ozmint, 377 F.3d 437, 448 (4th Cir. 2004) (internal quotation marks and citation omitted).  Thus, a federal court may consider only those issues which have been properly presented to the state appellate courts with jurisdiction to decide them. Generally, a federal habeas court should not review the merits of claims that would be found to be procedurally defaulted (or barred) under independent and adequate state procedural rules.  Lawrence



v. Branker, 517 F.3d 700, 714 (4th Cir. 2008); Longworth, 377 F.3d 437; see also Coleman v. Thompson, 501 U.S. 722 (1991). For a procedurally defaulted claim to be properly considered by a federal habeas court, the petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750.

**D.    Summary Judgment Motions**

**1.    Grounds One and Four**

King first appears to raise a freestanding claim challenging the admission of the tire iron evidence at trial based on DNA evidence, or lack thereof, and the State's alleged failure to disclose exculpatory evidence. However, the record reveals trial counsel did not object to the introduction of this evidence, which King appears to acknowledge by also claiming that trial counsel was ineffective in failing to raise such an objection.[3] Accordingly, the issue was not preserved for appellate review. See Mizell v. Glover, 570 S.E.2d 176, 180 (S.C. 2002) ("In order to preserve an issue for appellate review, the issue must have been raised to and ruled upon by the trial court.").

Similarly, to the extent that King is raising a freestanding claim of prosecutorial misconduct unrelated to his allegations of ineffective assistance of counsel, this issue was not presented to the lower state court and consequently was not preserved for appellate review. Id. Therefore, these claims are procedurally barred from federal habeas review, and King has failed to demonstrate cause and prejudice or that a fundamental miscarriage of justice will occur if these claims are not considered. See Coleman, 501 U.S. at 750; Wainwright v. Sykes, 433 U.S. 72 (1977); Lawrence, 517 F.3d at 714.

---

[3] The court will address this claim below in Ground Three.



2.      **Ground Two**

King next appears to challenge the trial court's decision to admit King's statement, which King alleges was taken while he was intoxicated and under the influence of a controlled substance. For the reasons that follow, the court finds that the trial court's decision did not unreasonably misapply clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding.

**Jackson v. Denno Hearing.**  Prior to King's trial, the trial court held a hearing pursuant to Jackson v. Denno, 378 U.S. 368 (1964),[4] to consider whether to admit into evidence King's statement provided on July 2, 2003.  (See App. at 18-67, ECF No. 23-8 at 20-69.)  The trial court first heard testimony from John McCord, a deputy with the Orangeburg County Sheriff's Office. After discussing his training and experience in taking statements from suspects, McCord described his involvement in King's arrest.  McCord testified that upon arriving at the scene, Deputy Stokes advised McCord that he had read King his rights.  McCord then also advised King of his rights from a card that McCord keeps in his wallet.  McCord indicated that King appeared to understand those rights. (App. at 20-23, ECF No. 23-8 at 22-25.)  McCord then transported King to the law complex and in one of the investigator rooms again advised McCord of his rights from an advisement of rights form and advised King regarding waiver of his rights, which King acknowledged understanding by signing both the advisement and the waiver form.  McCord testified that King appeared coherent when he reviewed King's rights with him and appeared to understand his rights.  McCord indicated that as a law enforcement officer, McCord had dealt with more than a hundred people under the

---

[4] The Jackson Court enunciated that a criminal defendant has a "constitutional right at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession."  Jackson, 378 U.S. at 376-77.



influence of drugs or alcohol and that King did not appear to be impaired, to be under the influence of alcohol or drugs, or to have any diminished mental capacity. McCord denied threatening or coercing King into giving a statement, denied promising King anything in return for a statement, and denied denying King any comforts. (App. at 23-29, ECF No. 23-8 at 25-31.)

During the hearing, Deputy McCord read his report that included his notes of King's verbal statement, and also read King's written statement. (App. at 30-33, 42, ECF No. 23-8 at 32-35.) McCord's notes indicated that around 5:00 p.m. on July 1st, after drinking "one twenty-four ounce malt liquor beer, brand, bull," King picked up the victim and their daughter from the Samaritan House, a homeless shelter. (App. at 30, ECF No. 23-8 at 32.) King stopped to purchase more beer and they returned to his residence. King indicated that later he hit the victim once to the head, who "fell and hit her head on the coffee table, causing it to shatter." (App. at 31, ECF No. 23-8 at 33.) King told McCord that the victim had blood on her head, but that the victim told King that she was fine and moved to lay on the floor. King stated that he cleaned up the glass and went to sleep on the couch with their one-year-old daughter. After King awoke, he stated that the victim was unresponsive even after he tried shaking her and pouring water on her. King called two people seeking advice, and was told to call the police. King told McCord that he, the victim, and their daughter were the only ones at the residence. McCord testified that King stated, " 'This is what you get, f___' and it's a profanity word, 'with a crack head living in a shelter.' " (App. at 32, ECF No. 23-6 at 34.) King informed McCord that he had taken their daughter away from the victim two weeks earlier because he did not want her living in a shelter and referred to the victim as a slut. (App. at 32-33, ECF No. 23-8 at 34-35.)

During cross-examination, McCord testified that upon arriving at the scene Stokes informed him that he had read King his Miranda rights, and that King informed Stokes that he had been



drinking and "snapped inside" causing him to strike the victim with a closed fist. (App. at 37, ECF No. 23-8 at 39.) McCord confirmed that King told him that King consumed a malt liquor drink before picking up the victim from the shelter, that King told him that King had purchased beer on the way to his residence, and that Stokes told him that King stated that he had been drinking. McCord stated that he did not ask King about his education; however, King affirmed that he understood his rights. (App. at 40-41, ECF No. 23-8 at 42-43.) King's written statement indicated that he and the victim got into a fight and that King recalled hitting her and she hit the table. King indicated that he remembered the victim sitting on the couch while he cleaned up the glass and stating that she was okay. King said he was sorry and the victim said it was okay. King indicated that the victim told him told to stop drinking, and he informed her that the relationship was over. He also appeared to indicate that they both went to sleep and when he awoke, he shook the victim but she did not move. King wrote that he put water on her but she did not wake up. King stated that his friend told him to call the police and he did. (App. at 41-42, ECF No. 23-8 at 43-44.) Counsel questioned McCord on the additional facts that were included in McCord's notes but were not included in King's written statement. (App. at 43-44, ECF No. 23-8 at 45-46.)

King testified that he had a history of "drinking and drugging." (App. at 47, ECF No. 23-8 at 49.) King stated that he was in recovery for four years, but after his mother died he returned to drinking and drugs. King testified that he drank heavily daily, about twelve twenty-four ounce beers or Schlitz Malt Liquor Bull, and would smoke two marijuana blunts a day. (App. at 48, ECF No. 23-8 at 50.) On the day in question, King stated that he remembered waking up, getting a beer, turning on the shower, burning some incense, smoking a blunt, waking his daughter up to watch a television show, changing and feeding his daughter, and mowing the lawn. King indicated that he did not remember anything else until he woke up in jail. King testified that he believed he had



twelve beers that day and smoked two cigar-sized marijuana blunts. King denied recalling any conversation with McCord or being advised of and waiving his <u>Miranda</u> rights. King stated that he did not remember making any statements to law enforcement; rather, he recalled being woken up in jail the next day and told that he had made a statement. Upon denying that he made any statement, King stated he was called a "liar," and King offered to take a polygraph test.[5] Finally, King affirmed that in a later document he invoked his rights and decided not to waive his rights. (App. at 50-52, ECF No. 23-8 at 52-54.)

The State argued it had shown that King was read his <u>Miranda</u> rights and advice of rights and had proven by a preponderance of the evidence that King's statement was freely and voluntarily given based on the testimony offered. Therefore, the State argued that King's statement should be admitted into evidence. (App. at 61, ECF No. 23-8 at 63.)

Defense counsel argued that, although involuntary intoxication is not a defense to a crime, based on controlling state case law, where an individual had insufficient mental capacity to know and understand what he was doing because his intoxication was such that he did not realize what he was saying, a statement obtained from him while he is in that condition is inadmissible. Defense counsel argued that based on the evidence demonstrating that McCord was aware King had been drinking and King's testimony that he had been drinking all day; had smoked two cigar-sized marijuana blunts; and did not recall waiving his rights, being advised of his rights, or making any statements, King did not have sufficient mental capacity to freely and voluntarily give a statement or intelligently and knowingly waive his rights. Defense counsel also argued that King's written

---

[5] The State's cross-examination focused on King's testimony regarding his recollection and the timing of the polygraph test. (App. at 53-60, ECF No. 23-8 at 55-62.)



statement was very incoherent, which counsel alleged supported King's argument that the statements

were inadmissible.  (App. at 62-64, ECF No. 23-8 at 64-66.)

The trial court deemed King's statement admissible.  Specifically, the trial court found the

following:

> THE COURT:  . . . Well, the State only has to prove by the preponderance of the
> evidence.  At this stage I think that the statement was freely and voluntarily given,
> but I find beyond a reasonable doubt that the statement was freely and voluntarily
> given.  He did write the statement in his own hand, didn't he?
>
> SOLICITOR PASCOE:  Yes, sir.
>
> THE COURT:  Some two, right at two hours, almost two hours after he had
> supposedly called a friend who told him to call nine one, and then he called nine one
> one.  It's true—I don't know what his educational background or what his command
> of the English language and grammar is, but you can get a pretty good message from
> the statement he wrote that he stays on the lines, it's very neatly written across there,
> even though he didn't write it like some English major would have written it.  It's
> certainly no—the officer testified that he felt like, after dealing with a number of
> intoxicated people, that Mr. King knew what he was doing and fully comprehended
> what was going on up there that night.  There's certainly no evidence that he was
> promised anything or that he was coerced or forced in any manner to sign the
> statement.  There's evidence that he was given all of his rights and that he waived
> those rights under Miranda.
>       So, I find that he freely and knowingly and intelligently waived his rights
> under the Fourth and Fifth Amendment, and that both the oral statement and the
> written statement would be admissible.  Of course, I will instruct the jury that it will
> be up for them to determine, number one, whether he made it, and if so, he made it
> freely and voluntarily, knowingly and intelligently.

(App. 65-66, ECF No. 23-8 at 67-68.)

**King's Claim.**  In support of his Petition on this Ground, King appears to generally challenge

the trial court's decision to admit the statement, arguing that the Fifth Amendment protects him from

being a witness against himself.[6]  Upon review of all of the filings in this matter and the record

---

[6] King also appears to argue that the State improperly referred to the statement as a
confession and again argues that the State failed to disclose exculpatory evidence; however, it is
unclear how these arguments relate to the trial court's decision to admit the statement.



before the trial court, the court finds, considering the totality of the evidence presented at the <u>Jackson v. Denno</u> hearing, that King has failed to rebut by clear and convincing evidence the presumption that the factual determinations of the state court are correct. <u>See</u> 28 U.S.C. § 2254(e)(1). Moreover, applying the law as clearly established by the United States Supreme Court regarding the suppression of statements to the surrounding facts presented to the trial court, this court finds no unreasonable application of law nor any unreasonable factual findings. Accordingly, King is not entitled to federal habeas relief on this claim.

### 3. Ground Three

King next appears to argue that trial counsel was ineffective in failing to (1) object to the introduction of the tire iron where it was not connected to incident with physical evidence; and (2) impeach witness Johnny Richardson with an inconsistent statement or object to Richardson's testimony. Further, King argues that although trial counsel objected to the admission of King's statement in the <u>Jackson v. Denno</u> hearing, he failed to introduce to the jury the booking photograph to show that King was under the influence at the time of the statement discussed above.

**Controlling Law Regarding Allegations of Ineffective Assistance of Counsel.** A defendant has a constitutional right to the effective assistance of counsel. To demonstrate ineffective assistance of counsel, a petitioner must show, pursuant to the two-prong test enunciated in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), that (1) his counsel was deficient in his representation and (2) he was prejudiced as a result. <u>Id.</u> at 687; <u>see</u> <u>also</u> <u>Williams v. Taylor</u>, 529 U.S. 362, 391 (2000) (stating that "the <u>Strickland</u> test provides sufficient guidance for resolving virtually all ineffective-assistance-of-counsel claims").

To satisfy the first prong of <u>Strickland</u>, a petitioner must show that trial counsel's errors were so serious that his performance was below the objective standard of reasonableness guaranteed by



the Sixth Amendment to the United States Constitution.  With regard to the second prong of Strickland, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  Prejudice may be presumed when (1) a defendant is completely denied counsel at a critical stage of his trial, (2) counsel "entirely fails to subject the prosecution's case to a meaningful adversarial testing," or (3) "although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." United States v. Cronic, 466 U.S. 648, 659 (1984).

The United States Supreme Court has cautioned federal habeas courts to "guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d)." Harrington, 131 S. Ct. 770, 788 (2010).  The Court observed that while " '[s]urmounting Strickland's high bar is never an easy task[,]' . . . [e]stablishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult." Id. (quoting Padilla v. Kentucky, 130 S. Ct. 1473, 1485 (2010)).  The Court instructed that the standards created under Strickland and § 2254(d) are both " 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." Id. (citations omitted).  Thus, when a federal habeas court reviews a state court's determination regarding an ineffective assistance of counsel claim, "[t]he question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id.

Although the Supreme Court has held that a decision containing a reasoned explanation is not required from the state court, in the case at bar this court has the benefit of the PCR court's written opinion, certiorari review of which was denied by the South Carolina Supreme Court.  See,



e.g., Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991) (indicating that when a state appellate court affirms a lower court decision without reasoning, the court may look through the later, unreasoned, summary disposition and focus on the last reasoned decision of the state court). Having reviewed the PCR court's order pursuant to the § 2254 standard, the court finds for the reasons that follow that the state court did not unreasonably misapply the Strickland test in determining that no Sixth Amendment violation occurred.

**PCR Proceedings Regarding Ineffective Assistance of Counsel.** King's PCR counsel indicated that King's was essentially raising three claims of ineffective assistance of trial counsel, which she summarized as follows: (1) trial counsel was ineffective in failing to adequately challenge or question Johnny Richardson, a witness, concerning different or conflicting versions of a statement; (2) trial counsel was ineffective in failing to present King's booking photograph at the Jackson v. Denno hearing to support King's claim that his intoxication prevented him from giving a knowing and voluntary statement; and (3) trial counsel was ineffective in failing to explore the fact that evidence in discovery indicated that there was no blood on the tire iron, which King alleged was the "lynchpin" of the prosecution's case because the prosecution argued that the tire iron was used to kill the victim. (App. at 402-05, ECF No. 23-11 at 2-5; see also App. at 453-54, ECF No. 23-11 at 53-54.) PCR counsel further stated that although King mentions a Brady violation, she believed that King had not characterized his claim correctly and stated that the claim was encompassed in the issues discussed above. (App. at 405-06, ECF No. 23-11 at 5-6.)

During the PCR hearing, King testified that he woke up in jail without any recollection of what had occurred and was informed he had given a statement. King believed that the booking photograph demonstrated that he was impaired at the time of his arrest and not able to give a knowing and voluntary statement. King testified that his statement was taken at 2:55 a.m. and the



booking photograph was taken at 4:27 a.m.  King appears to have argued that the photograph was not produced by the State, and that he informed trial counsel that the photograph would probably show he was intoxicated.  King argued that trial counsel should have sought out the photograph. King stated that he discovered the photograph around June 2009 and testified that the photograph shows that he was intoxicated based on his eyes.  (App. at 409-15, ECF No. 23-11 at 9-15.)  King also appears to have argued that trial counsel failed to subpoena a witness that could have bolstered his claim of intoxication.  (App. at 415-16, ECF No. 23-11 at 15-16.)

King next appears to have alleged that the discovery revealed that the SLED analysis of the tire iron indicated that the tire iron was swabbed and SLED was either unable to obtain any blood from the tire iron or unable to generate a DNA profile from the tire iron.  Therefore, King argued that since the State referred to the tire iron as the "murder weapon" and indicated that there was blood on the tire iron, trial counsel should have presented evidence to the jury that SLED was unable to produce a DNA profile from the tire iron because there was not any blood on it.  King affirmed that he believed that trial counsel was ineffective in failing to present this evidence or discuss this evidence with King prior to trial.  (App. at 416-21, ECF No. 23-11 at 16-21.)  King later affirmed that trial counsel should have challenged the admission of the tire iron based on this evidence.

Finally, King alleged that Mr. Richardson, a witness for the State, provided conflicting statements.  King argued that in the first statement, Richardson stated that on June 30 Richardson saw King back King's car into a van in front of the Samaritan House and then leave after picking up the victim.  King testified that Richardson's next statement indicated that he saw King on July 2 and that someone had told Richardson that King was being rude to the victim.  Finally, King stated that at trial, Richardson testified that these events occurred on July 1.  (App. at 421-22, ECF No. 23-11 at 21-22.)  King argued that trial counsel touched on this discrepancy but that trial counsel should



have "brought it out" more.  (App. at 423, ECF No. 23-11 at 23.)  Specifically, King testified that trial counsel stated that Richardson did not know what date that he saw King, but that trial counsel should have let the jurors know that Richardson gave three different statements with different dates and times to show inconsistency and lack of knowledge.  (Id.)

King also appears to have argued that based on a letter that trial counsel sent him in 2006, indicating that someone had left two messages for trial counsel claiming to have information on King's case, trial counsel failed to adequately investigate his case.  King appears to have asserted that this evidence demonstrates that had trial counsel sufficiently investigated his case, trial counsel would have uncovered whatever this information was for King's trial.  (App. at 425-27, ECF No. 23-11 at 25-27.)  King then mentioned that some of the State's witnesses provided false testimony to which trial counsel did not fully object.

Robert Hood, King's trial counsel, then testified.  Hood stated that his firm was appointed to represent King approximately two years after the incident occurred after a conflict arose with prior representation.  Hood indicated that King wanted to go to trial quickly and Hood immediately began working on King's case.  Hood believed King had some significant mental health issues and sought a mental evaluation, which concluded that King was competent to proceed to trial and that there was criminal responsibility.  Hood believed King's strongest argument was that King's intoxication and abuse of drugs made him incapable of voluntarily giving a statement, and Hood stated that he discussed this issue for hours with King.  Hood negotiated to get some of King's confessions excluded, but a Jackson v. Denno hearing was held on King's statement to law enforcement.  (App. at 433-35, ECF No. 23-11 at 33-35.)  Hood stated that he had no doubt that King was extremely intoxicated on drugs and alcohol, and he "pounded that issue home as hard as [he] possibly could" with the trial judge, including King's testimony.  (App. at 435, ECF No. 23-11 at 35.)  Hood testified

that although they "fought like there was no tomorrow to try to . . . keep those statements out, because that really was the most damaging evidence against Mr. King in what was otherwise [an] extremely violent and brutal homicide," the trial judge ruled that they were admissible. (App. at 436, ECF No. 23-11 at 36.)  With regard to the booking photograph, Hood stated that he had never seen the photograph, and after viewing the image at the PCR hearing, Hood testified that he did not believe it would have made a difference on his intoxication argument because the best evidence of King's intoxication was King's testimony.  Hood indicated that King testified clearly, was not difficult to understand or follow, and that he believed that the photograph would not have changed the trial judge's ruling that the statements were admissible or the jury's decision in King's case. (App. at 437-39, ECF No. 23-11 at 37-39.)

When questioned about the tire iron, Hood stated that the crime scene encompassed almost all of the house, and that in his opinion the house was covered in blood.  Further, Hood testified that the car King was seen in was covered in blood and there was blood from the car to the house.  Hood stated that some items had enough blood on them to get an accurate DNA profile, while others did not.  Hood testified that many different objects could have been used as the murder weapon, but the solicitor chose to argue that the tire iron was the murder weapon.  Hood agreed that no DNA profile was obtained from the swab of the tire iron.  When asked what he did to challenge the solicitor's position, Hood stated that he did not think the jury was focused on the tire iron, but on King's statements that he had killed the victim.  Hood testified that a number of objects, including a wooden frog or King's fists, could have been the murder weapon, so his focus was not on which object could have been the murder weapon.  Considering that the jurors were also presented with photographs showing all the evidence taken from the house covered in blood, Hood stated that he thought the best argument was that King's clothes were never tested for blood and none of the officers recalled seeing



any blood on King's clothes. Hood stated that an investigator testified for two to three hours on the poor job that SLED did in securing and analyzing the evidence, which Hood raised in his closing argument. Hood also testified that he argued that there was blood and blood spatter on the wall, in the bathroom, on the television; however, no one found a drop of blood on King. Therefore, Hood stated that since the tire iron was collected from the crime scene, it would be admissible, and he pointed out during cross-examination that there was not any DNA or blood on some objects, but the tire iron was not Hood's focus. (App. at 439-43, ECF No. 23-11 at 39-43.)

With regard to Richardson, Hood stated that he did not speak to him prior to trial because he was "not friendly" with the defense. (App. at 443, ECF No. 23-11 at 43.) Hood testified that he questioned Richardson at trial about his divergent statements with different dates. However, Hood focused on the fact that Richardson "knew the history of the relationship between [King and the victim], [Richardson] knew Mr. King was intoxicated, and [Richardson] let this woman get in the car with [King]. And [Richardson] watched a hit-and-run happen, [Richardson] knew who Mr. King was, and [Richardson] didn't do anything about it." (App. at 445, ECF No. 23-11 at 45.) Hood testified that he was trying to discredit Richardson because he was the last person to see King and the victim together, and he believed focusing more on the discrepancies in the dates indicated in Richardson's statements would not have made a difference.

Hood also confirmed that he had forwarded to the solicitor and King the information from the unknown caller claiming to have information about the King case and claiming to fear for his or her safety. Hood stated that he was unable to get any other substantive information from the caller and believed his actions fulfilled his obligations. (App. at 446-48, ECF No. 23-11 at 46-48.) Hood stated that he, other attorneys with his office, and the investigator met with King and all of the discovery was reviewed with King. (App. at 448-49, ECF No. 23-11 at 48-49.) Finally, Hood



indicated that the witness that King believed should have been subpoenaed to testify in support of his assertion that he was intoxicated was interviewed by Hood's investigator and the witness stated that she had no memory of seeing King that night.  (App. at 449, ECF No. 23-11 at 49.)

In considering King's allegations of ineffective assistance of counsel, the PCR court summarized the facts adduced at trial as follows:

> According to eyewitness Johnny Richardson ("Richardson"), Applicant picked up victim Sonya Vereen ("Victim") from the homeless shelter where she lived around 5:00 pm.  Richardson reported that Applicant pulled up in his red Cadillac then backed into a van.  Applicant then came inside, uttering profanity to Victim. Richardson reported that Applicant appeared to be intoxicated.  Victim got into Applicant's car.  Richardson noted an infant seat in the car.  Richardson later assisted the driver of the van in calling police to report the damage.
>
> Later that night, officers responding to a call at Applicant's home found Victim dead on the floor inside.  Victim was only partially clothed, appeared to have been severely beaten and had sand in her hair.  Applicant and Victim's small child [were] removed from the scene.
>
> Applicant was taken into custody.  He gave oral and written statements indicating that he had hit Victim and she had fallen, shattering the glass coffee table. However, she had been fine and he went to sleep on the couch with his infant daughter.  When he awoke, Victim was unresponsive.
>
> Dr. Joel Sexton opined that Victim died from multiple blunt force injuries. She had suffered lacerations from a blunt object on her legs and scalp; bruises to her back, arm, chest, and neck; a linear abrasion consistent with a ligature to the front of her neck; and abrasions to the face.  She had hemorrhaging in the brain consistent with multiple blunt force strikes to the head.  The injuries were caused by multiple strikes.  Some of the wounds were consistent with, but not definitively caused by, a tire iron found in the home.  No drugs or alcohol, only Tylenol and nicotine, were found in Victim's system.  Dr. Sexton opined that the blunt force trauma to the head was the cause of death, with death resulting within minutes.  Strangulation could not be excluded as a cause of death.
>
> A pair of women's shoes were found outside Applicant's home one behind and one in front of Applicant's red Cadillac.  Blood spatter, determined to be Victim's, was found inside the Cadillac.  The Cadillac was found missing a tire. Near the front steps, Victim's blood was found and there appeared to have been a scuffle in the sand.  Victim's body was found on the living room floor, and blood was on many of the items nearby.  A pair of men's shoes had blood on the insole.  Blood spatter was found on objects around the room, including upward cast off spatter on the television screen.  Pieces of a frog wall ornament and an extension cord were found to have Victim's blood on them.  A tire iron also had human blood on it, but the laboratory was unable to develop a DNA profile.  Carpeting near the tire iron



contained Victim's blood. A trash bag in the kitchen contained glass from the top of a coffee table, part of the frog's ornament, and a beer can with blood on it. The portion of the frog ornament from the trash bag also had Victim's blood on it. Victim's blood was found in the bathroom down the hall. No testing was done on Applicant's clothing.

(App. at 461-62, ECF No. 23-11 at 61-62.) The PCR court also summarized the testimony presented at the PCR hearing as well as at the Jackson v. Denno hearing, which is discussed above.

The PCR court rejected each of King's allegations of ineffective assistance of counsel. First, the PCR court did not find that trial counsel's "failure to procure the booking photograph to be outside of reasonable professional norms." (App. at 464, ECF No.23-11 at 64.) The PCR court found that the booking photograph would not have affected the outcome of King's trial, and that the trial court's ruling on the admissibility of the statement shows that the judge "weighed factors such as the officer's testimony and the handwriting on the statement in concluding that while Applicant may have been intoxicated, he was able to realize what he was saying." (Id.) Moreover, the PCR court determined that "[e]ven with the booking photograph, evidence would support the trial court's ruling that the statement was admissible. I further find it unlikely that admission of the photograph would have affected the jury's verdict. Even if the jury were to discount the statement entirely, there was abundant evidence upon which to infer guilt." (Id.)

With regard to the tire iron, the PCR court found that the fact that no DNA profile was obtained from the tire iron was presented by trial counsel to the jury. The PCR court further found that "[i]t is unclear what additional cross-examination or argument counsel should have made on this point. Counsel's stated reasons for focusing on certain facts in keeping with his theme [were] reasonable, especially in light of the fact that other objects in the home could have caused the injuries." (App. at 465, ECF No. 23-11 at 65.) Additionally, the PCR court determined that there



was "no evidence that additional cross-examination or argument would have changed the outcome of the trial in light of the evidence presented." (<u>Id.</u>)

Finally, the PCR court found that contrary to King's arguments, trial counsel cross-examined Richardson regarding the discrepancy about the dates in his statements, and addressed this issue in his closing argument. The PCR court determined that trial counsel's "stated reasons for pursuing the line of questioning and theme in closing were reasonable. It is unclear what additional actions Applicant believes Counsel could have taken in this regard." (App. at 466, ECF No. 23-11 at 66.) The PCR court also found that nothing indicated that "additional questioning or argument on this point would have yielded a different result." (<u>Id.</u>)

Accordingly, the PCR court appears to have found that King failed to demonstrate either that trial counsel's performance was deficient or that King was prejudiced by any alleged deficiency.

**King's Habeas Claim Regarding Ineffective Assistance of Counsel.** Upon thorough review of the parties' filings and the record in this matter, the court finds that King cannot demonstrate that the PCR court unreasonably misapplied clearly established federal law as decided by the Supreme Court in rejecting his claims of ineffective assistance of counsel or that the PCR court made objectively unreasonable factual findings. See <u>Williams</u>, 529 U.S. at 410; 28 U.S.C. § 2254(d), (e)(1). As observed by the <u>Harrington</u> court, "[t]he pivotal question is whether the state court's application of the <u>Strickland</u> standard was unreasonable. This is different from asking whether defense counsel's performance fell below <u>Strickland</u>'s standard." <u>Harrington</u>, 131 S. Ct. at 785.

King essentially appears to reiterate the arguments he presented to the PCR court in support of his arguments that trial counsel was ineffective. Upon careful review of the transcript and the PCR court's order, for all of the reasons discussed by the PCR court, the court concludes that King



has failed to establish that trial counsel's action were error, much less that they were objectively unreasonable such that it rendered his performance deficient. Moreover, King has failed to demonstrate that there is a reasonable probability that the result of the proceeding would have been different if trial counsel had introduced the booking photograph, more thoroughly explored the lack of a DNA profile on the tire iron or objected to its introduction based on the lack of DNA profile, or further questioned Richardson about the discrepancies in his statements. Strickland, 466 U.S. at 694. Therefore, King has not shown that the PCR court's analysis of this issue misapplied clearly established federal law or, even if there was an error, that it was unreasonable. See Williams, 529 U.S. at 410.

**E.    Other Motions**

Also pending before the court is King's motion seeking "forensic DNA testing." (ECF No. 45.) It appears that King would like the tire iron tested again. However, it is unclear how this testing will support his Petition in light of the evidence presented at trial that SLED's test indicated that no DNA profile was obtained from the tire iron. Therefore, this motion should be denied. Moreover, to the extent that King seeks an evidentiary hearing to submit new evidence to support his Petition, the court observes that its review for habeas corpus purposes is generally limited to the evidence that was placed before the state court. See Cullen v. Pinholster, 131 S. Ct. 1388, 1398, 1400 n.7 (2011); see also 28 U.S.C. § 2254(d)(2). King has not established that any exception to this general rule applies here. See Cullen, 131 S. Ct. at 1400-01; see also 28 U.S.C. § 2254(e)(2).

PJG

## RECOMMENDATION

For the foregoing reasons, the court recommends that the respondent's motion for summary judgment (ECF No. 22) be granted and King's motion for summary judgment (ECF No. 27) be denied.  Further, the court recommends that King's motion to expand the record, for a hearing, and to vacate his sentence be denied (ECF Nos. 28, 32, & 45) and the remaining motions be terminated (ECF Nos. 38 & 48).

_____
Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE

May 21, 2013
Columbia, South Carolina

*The parties' attention is directed to the important notice on the next page.*

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  <u>Diamond v. Colonial Life & Acc. Ins. Co.,</u> 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); <u>see</u> Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).